=================================================================
This opinion is uncorrected and subject to revision before
publication in the New York Reports.
-----------------------------------------------------------------
No. 131
The Ministers and Missionaries
Benefit Board,
        Interpleader Plaintiff,
        v.
Leon Snow et al.,
        Appellants,
        v.
The Estate of Clark Flesher, et
al.,
        Respondents.


        Jesse T. Wilkins, for appellants.
        Brian Rosner, for respondents.


STEIN, J.:

        In IRB-Brasil Resseguros, S.A. v Inepar Invs., S.A. (20

NY3d 310 [2012], cert denied ___ US ___, 133 S Ct 2396 [2013]),

this Court held that, where parties include a New York

choice-of-law clause in a contract, such a provision demonstrates

the parties' intent that courts not conduct a conflict-of-laws

- 1 -

analysis (see id. at 312).  We now extend that holding to contracts that do not fall under General Obligations Law § 5-1401, and clarify that this rule obviates the application of both common-law conflict-of-laws principles and statutory choice-of-law directives, unless the parties expressly indicate otherwise.

I.

Plaintiff Ministers and Missionaries Benefit Board (MMBB) is a New York not-for-profit corporation, based in New York County, that administers a retirement plan and a death benefit plan for certain ministers and missionaries.  Decedent Clark Flesher was a minister enrolled in both plans.  He named his then-wife, defendant LeAnn Snow, as his primary beneficiary and her father, defendant Leon Snow, as the contingent beneficiary.  Both plans state that they "shall be governed by and construed in accordance with the laws of the State of New York."

Flesher and LeAnn Snow divorced in 2008.  Flesher moved to Colorado in 2010 and died there in 2011.  A Colorado court has apparently admitted his will to probate, naming his sister, defendant Michele Arnoldy, as personal representative of the estate.  Despite the divorce, Flesher never changed his beneficiary designations under the MMBB plans.  Because MMBB was unsure to whom the plan benefits should be paid after Flesher's death, it commenced a federal interpleader action against

Flesher's Estate, Arnoldy (individually and as personal representative of the Estate), LeAnn Snow and Leon Snow.[1]

The United States District Court for the Southern District of New York (Griesa, J.) allowed MMBB to post a bond and be released from the case, with the obligation to pay the benefits as the court directs. Arnoldy and the Estate moved for summary judgment, and the Snows cross-moved for summary judgment. The District Court (Forrest, J.) denied the Snows' motion, granted the motion of Arnoldy and the Estate and directed MMBB to pay the disputed funds to Arnoldy, as representative of the Estate. In making that determination, the District Court reasoned that: (1) the parties agreed that the relevant choice-of-law rules are the rules of New York, as the forum state; (2) the disputed funds constitute personal property; (3) under EPTL 3-5.1 (b) (2), revocation of a disposition of personal property, where such property is not disposed of by a will, is determined by the law of the state where the decedent was domiciled at the time of death; (4) Flesher was domiciled in Colorado at the time of his death, so Colorado law applied; and (5) Colorado's revocation law terminated any claims to the plans by both Snows (i.e., the former spouse and her relatives) when

---

[1] The complaint was filed in federal court based on diversity of the parties. MMBB is a New York corporation, the Estate is considered a resident of Colorado, Arnoldy resides in North Carolina, LeAnn Snow resides in California and Leon Snow resides in Minnesota.

Flesher and LeAnn Snow were divorced.

On the Snows' appeal, the Second Circuit Court of Appeals determined that there were important and unanswered questions of New York law and, therefore, certified two questions to this Court before deciding the appeal (780 F3d 150 [2d Cir 2015]).  Those questions are:

> "(1) Whether a governing-law provision that states that the contract will be governed by and construed in accordance with the laws of the State of New York, in a contract not consummated pursuant to New York General Obligations Law section 5-1401, requires the application of New York Estates, Powers & Trusts Law section 3-5.1 (b) (2), a New York statute that may, in turn, require application of the law of another state?
>
> (2) If so, whether a person's entitlement to proceeds under a death benefit or retirement plan, paid upon the death of the person making the designation, constitutes 'personal property . . . not disposed of by will' within the meaning of New York Estates, Powers & Trusts Law section 3-5.1 (b) (2)?"
>
> (780 F3d at 155).

This Court accepted the certified questions (25 NY3d 935 [2015]).  We now answer the first question in the negative and, accordingly, have no occasion to reach the second question.

II.

The retirement and death benefit plans here each state that they "shall be governed by and construed in accordance with the laws of the State of New York."  The first certified question essentially asks us how to interpret the phrase "laws of . . .

New York" in those contractual provisions.

We begin with the basic premises that courts will generally enforce choice-of-law clauses and that contracts should be interpreted so as to effectuate the parties' intent (see Welsbach Elec. Corp. v MasTec N. Am., Inc., 7 NY3d 624, 629 [2006]).  In a case based on New York law, the United States Supreme Court held that a choice-of-law provision in a contract "may reasonably be read as merely a substitute for the conflict-of-laws analysis that otherwise would determine what law to apply to disputes arising out of the contractual relationship" (Mastrobuono v Shearson Lehman Hutton, Inc., 514 US 52, 59 [1995]).  Thus, the parties here agree that, pursuant to the choice-of-law provisions in the MMBB plans, the contracts will be governed only by New York's substantive law, not by New York's common-law conflict-of-laws rules.

Nevertheless, we must decide whether the New York law to be applied includes a New York statutory choice-of-law directive, such as EPTL 3-5.1 (b) (2).  That statute provides that "[t]he intrinsic validity, effect, revocation or alteration of a testamentary disposition of personal property, and the manner in which such property devolves when not disposed of by will, are determined by the law of the jurisdiction in which the decedent was domiciled at death" (EPTL 3-5.1 [b] [2]).[2]  The

_____

    [2] The District Court determined that Flesher was a Colorado domiciliary.  While the Snows apparently continue to dispute

question is whether section 3-5.1 (b) (2) should be characterized
as part of New York's substantive or "local law," which the
contracting parties intended to apply, or whether it is simply a
conflict-of-laws rule, which they did not intend to apply.  The
answer to this question is crucial here because the recipients of
the MMBB plan benefits will be different depending on whether
courts apply the law of New York or the law of Colorado.

As for indisputably substantive New York law, EPTL
5-1.4 (a) states that,

> "[e]xcept as provided by the express terms of
> a governing instrument, a divorce . . .
> revokes any revocable (1) disposition or
> appointment of property made by a divorced
> individual to, or for the benefit of, the
> former spouse, including, but not limited to,
> a disposition or appointment by will, . . .
> by beneficiary designation in a life
> insurance policy or (to the extent permitted
> by law) in a pension or retirement benefits
> plan."

The plans here fall under the definition of governing instruments
(see EPTL 5-1.4 [f] [5]).  Thus, under New York's purely
substantive law, Flesher's designation of LeAnn Snow as a
beneficiary of the plans was revoked upon their divorce in 2008,
while the designation of Leon Snow as contingent beneficiary
remained in effect (see Matter of Lewis, 25 NY3d 456, 459

---

Flesher's domicile, that issue is not before us given the
procedural posture of this case.  Thus, for purposes of this
appeal, we assume that Flesher was domiciled in Colorado at the
time of his death.

[2015]).

In contrast, the relevant Colorado statute provides that a divorce acts to revoke any dispositions or appointments by the divorced person to his or her former spouse and to relatives of the former spouse (see Colo Rev Stat § 15-11-804 [2]). Colorado courts have confirmed that the term "governing instruments" in that state's revocation statute includes designations of beneficiaries in life insurance policies (see Matter of Johnson, 304 P3d 614, 616 [Colo Ct of Appeals 2012], cert denied 2013 WL 3321113 [Colo July 1, 2013]). Because Leon Snow, as the father of LeAnn Snow, falls within the definition of a "[r]elative of the divorced individual's former spouse" in relation to Flesher (Colo Rev Stat § 15-11-804 [1] [e]), under Colorado law, the divorce revoked the designations of both LeAnn Snow and Leon Snow as beneficiaries of the MMBB plans.

The Second Circuit concluded that this case presented a close question based, in part, on this Court's recent decision in IRB-Brasil Resseguros, S.A. (20 NY3d 310). There, we decided that the need for a conflict-of-laws analysis is obviated by a contract, made pursuant to General Obligations Law § 5-1401, that contains a New York choice-of-law clause (see id. at 312). Section 5-1401 embodies the Legislature's desire to encourage parties to choose the New York justice system to govern their contractual disputes (see id. at 314-315). In IRB, we concluded that, where a contract met the requirements of General

Obligations Law § 5-1401 -- including that the transaction exceeded $250,000 and the parties designated New York law as controlling -- "New York substantive law must govern" and "[e]xpress contract language excluding New York's conflict-of-laws principles is not necessary" (id. at 315). We reasoned that, "[t]o find . . . that courts must engage in a conflict-of-laws analysis despite the parties' plainly expressed desire to apply New York law would frustrate the Legislature's purpose of encouraging a predictable contractual choice of New York commercial law and, crucially, of eliminating uncertainty regarding the governing law" (id. at 316). Significantly, this Court noted that the Restatement (Second) of Conflict of Laws § 187 (3) supports the same result (see IRB-Brasil Resseguros, S.A., 20 NY3d at 316). Section 187 (3) provides that, in the absence of an expressed contrary intention, references to the law of a state chosen by the parties means the "local law" of that state (see IRB-Brasil Resseguros, S.A., 20 NY3d at 316), which is defined elsewhere in the Restatement as the chosen state's "body of standards, principles and rules, exclusive of its rules of Conflict of Laws, which the courts of that state apply in the decision of controversies brought before them" (Restatement [Second] of Conflict of Laws § 4 [1] [emphasis added]).[3]

Referring to New York's overarching principle of

---

[3] A state's standards, principles and rules would be treated equally under that definition, regardless of whether they were expressed in the common law or in statutes.

providing certainty and finality to contracting parties, the

Court in <u>IRB</u> concluded by saying that

>"[i]t strains credulity that the parties
>would have chosen to leave the question of
>the applicable substantive law unanswered and
>would have desired a court to engage in a
>complicated conflict-of-laws analysis,
>delaying resolution of any dispute and
>increasing litigation expenses.  We therefore
>conclude that parties are not required to
>expressly exclude New York conflict-of-laws
>principles in their choice-of-law provision
>in order to avail themselves of New York
>substantive law.  Indeed, in the event
>parties wish to employ New York's
>conflict-of-laws principles to determine the
>applicable substantive law, they can
>expressly so designate in their contract"
>(<u>IRB-Brasil Resseguros, S.A.</u>, 20 NY3d at
>316).

Although <u>IRB</u> concerned only common-law conflict-of-laws

principles, whereas EPTL 3-5.1 (b) (2) is a statutory choice-of-

law directive, the latter is merely a codification of a long-

standing common-law conflict-of-laws principle, eventually placed

within the EPTL because it corresponds to that general area of

law (<u>see</u> <u>Matter of Gifford</u>, 279 NY 470, 474-475 [1939];

<u>Chamberlain v Chamberlain</u>, 43 NY 424, 433 [1871]; <u>Parsons v

Lyman</u>, 20 NY 103, 112 [1859]; <u>Holmes v Remsen</u>, 4 Johns Ch 460,

470 [NY Ch Ct 1820]; <u>see also</u> EPTL 3-5.1 [b], derived from former

Decedent Estate Law § 47, derived from former Code of Civil

Procedure § 2694; L 1966, ch 952).  While the EPTL may have

initially been created, at least in part, to revise the substance

of New York estates law, the placement of section 3-5.1 (b) (2)

within the EPTL primarily served another of its creators'
purposes, which was to organize the statutes addressing that area
of the law and consolidate them into one source (see Governor's
Mem of Approval, Bill Jacket, L 1966, ch 952 at 91 [while noting
that the bill enacting the EPTL and SCPA made numerous changes in
substantive law, one of the "chief virtues" was the consolidation
of statutes pertaining to estates law that were previously
scattered throughout numerous other areas of law]; Mem of Temp
Commn on Law of Estates, 1966 NY Legis Ann at 121 [the Commission
made an effort to keep substantive changes to a minimum, worked
to simplify the form of the statutes, and perhaps the most
notable contribution the new EPTL makes is its format, compiling
estates law in one source]).  Although codification may be an
indication that the Legislature attaches some importance to the
rule, EPTL 3-5.1 (b) (2) nevertheless remains, in its essence, a
conflict-of-laws rule, rather than a statement of substantive
law.  The fact that the Legislature may have made a substantive
decision to codify the rule, or had a substantive public policy
reason for placing the former common-law rule within a statute,
does not somehow elevate or transform this conflict-of-laws
directive into a statement of substantive law.[4]

---

[4] Thus, the fact that EPTL 3-5.1 (b) (2) is contained within
EPTL article 3, which is entitled "[s]ubstantive [l]aw of
[w]ills," is not determinative of its character.  Due to the
practicality of attempting to organize all of the statutory
rules, by putting provisions that relate to one another together
or in close proximity, portions of statutes may be placed in an

To be sure, our decision in IRB does not preclude a different result here. However, our conclusion in that case -- that when parties include a choice-of-law provision in a contract, they intend application of only that state's "substantive law" (IRB-Brasil Resseguros, S.A., 20 NY3d at 315) -- is equally applicable to the contracts now before us. If New York's common-law conflict-of-laws principles should not apply when the parties have chosen New York law to govern their dispute -- a point on which all parties to this appeal agree -- and EPTL 3-5.1 (b) (2) simply represents a common-law conflicts principle that has been codified into statute, that provision should not be considered in resolving this dispute.[5]

_____

article or section whose title -- while correctly applying to that article or section in general -- does not accurately reflect every individual provision therein. Nevertheless, a statutory provision that is, by its nature, procedural cannot be converted into substantive law by virtue of the title of the overall article including that particular provision (see Squadrito v Griebsch, 1 NY2d 471, 475 [1956] [text of statute takes precedence over title, which cannot alter or limit the language in the body of a statute itself]; McKinney's Cons Law of NY, Statutes § 123 [a]).

    [5] The Restatement (Second) of Conflict of Laws § 6 (1) states that "[a] court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law." While that section articulates a general rule -- a fairly basic and uncontroversial proposition -- that courts must follow statutory directives, contracting parties are generally free to include provisions altering the application of certain state laws to disputes concerning their contract (see Welsbach Elec. Corp., 7 NY3d at 629). Thus, that section of the Restatement does not suggest that courts should apply a statutory choice-of-law directive when interpreting a contract containing a choice-of-law provision.

Stated differently, New York courts should not engage in any conflicts analysis where the parties include a choice-of-law provision in their contract, even if the contract is one that does not fall within General Obligations Law § 5-1401.  That provision applies only to contracts for transactions involving an aggregate of over $250,000, but it specifically states that "[n]othing contained [herein] shall be construed to limit or deny the enforcement of any provision respecting choice of law in any other contract" (General Obligations Law § 5-1401 [2]).[6]  While IRB does not entirely answer the current question because that case does not address the applicability of a statutory choice-of-law directive, logic dictates that, by including a choice-of-law provision in their contracts, the parties intended for only New York substantive law to apply (see IRB-Brasil Resseguros, S.A., 20 NY3d at 315-316; see also Mastrobuono, 514 US at 63-64 [harmonizing choice-of-law provision and arbitration provision by reading the phrase "laws of the State of New York" to include New York substantive principles that courts would apply, but not include special rules limiting arbitrators' authority]).  A contrary interpretation is

_____

[6] It is unclear from the current record whether the amount due under either individual MMBB plan is more than $250,000. However, the combined benefits due under the two plans now exceed that amount.  While the parties appear to acknowledge that General Obligations Law § 5-1401 does not apply to the MMBB plans, our decision here ensures that all contractual choice-of-law provisions are interpreted under the same rules, regardless of the amount at issue.

conceivable.  However, we should apply the most reasonable
interpretation of the contract language that effectuates the
parties' intended and expressed choice of law (see Welsbach Elec.
Corp., 7 NY3d at 629).  To do otherwise -- by applying New York's
statutory conflict-of-laws principles, even if doing so results
in the application of the substantive law of another state --
would contravene the primary purpose of including a choice-of-law
provision in a contract -- namely, to avoid a conflict-of-laws
analysis and its associated time and expense.[7]  Such an
interpretation would also interfere with, and ignore, the
parties' intent, contrary to the basic tenets of contract
interpretation.

Moreover, allowing the application of a statutory
choice-of-law directive would mean that the contracts here could
be interpreted differently for each plan member, depending on
where the member was domiciled at the time of his or her death.
It seems unlikely that MMBB intended to have its contracts -- a
retirement plan and a death benefit plan -- interpreted in many
different ways based on the whim and movements of its plan
members.  The intention to provide for predictable results

---

[7] The dissent takes issue with our conclusion regarding the
ability of parties to waive application of EPTL 3-5.1 (b) (2)
(see Dissent at 22).  To be clear, our analysis is not primarily
based on that statute's origins in the common law.  Further, our
holding narrowly addresses waiver based only on the nature of the
statute -- namely, a choice-of-law directive -- as a natural
extension of our holding in IRB.

regarding the distribution of funds to beneficiaries is particularly apt for these plans, which are issued to ministers and missionaries, who presumably are more likely than the general population to move often and who may live in all parts of the world, not just in different states.  Contractually planning for the application of New York substantive law regarding benefit distribution would provide stability, certainty, predictability and convenience (see Restatement [Second] of Conflict of Laws § 187, Comment h), so that MMBB could easily determine who should receive plan benefits.[8]

Conversely, if application of the statutory choice-of-law provision -- EPTL 3-5.1 (b) (2) -- was required, it would be necessary for MMBB to keep abreast of the laws of all other states and nations to ensure that it paid the proper beneficiaries, which would invite the very uncertainties that MMBB and the plan members presumably intended to avoid.  While it

---

[8] There is no reason to assume that the parties would expect that death benefits under the MMBB plans would be subject to the laws of the decedent's domicile state simply because a majority of states follow that rule.  To the contrary, the parties here reasonably could have believed that courts would apply the substantive law of New York -- without resorting to any conflict-of-laws rules or the laws of any other state -- based on the choice-of-law provisions in the contracts at issue.  It was not necessary for the parties to explicitly waive the application of the domicile-based rule, or EPTL 3-5.1 (b) (2) itself, in the contracts.  As we held in IRB, parties are not required to expressly exclude New York common-law conflict-of-laws principles in a contractual choice-of-law provision (see IRB-Brasil Resseguros, S.A., 20 NY3d at 316).  That rule similarly applies to New York statutory choice-of-law directives.

might appear to be a simple task to determine a decedent's domicile at the time of his or her death, that will not always be the case.  Therefore, we hold that, when parties include a choice-of-law provision in a contract, they intend that the law of the chosen state -- and no other state -- will be applied.  In such a situation, the chosen state's substantive law -- but not its common-law conflict-of-laws principles or statutory choice-of-law directives -- is to be applied, unless the parties expressly indicate otherwise.

Accordingly, the first certified question should be answered in the negative and the second certified question not answered as academic.

The Ministers and Missionaries Benefit Board v Leon Snow et al.
v The Estate of Clark Flesher et al.

No. 131

ABDUS-SALAAM, J. (dissenting):

When is a duly enacted law of the State of New York not part of "the laws of the State of New York"?  One would think that the answer is never.  But the majority disagrees.  In the majority's estimation, a law passed by New York elected

- 1 -

representatives is not part of the "laws of the State of New York" if those legislators modeled the statute on a common-law rule specifying a particular jurisdiction's laws as controlling the disposition of a person's property upon death. Thus, the majority holds that, where a governing-law clause in a death or retirement benefit plan declares that the "laws of the State of New York" are controlling, the clause waives the application of Estates Powers & Trusts Law ("EPTL") § 3-5.1 (b) (2), which is a properly enacted law of New York dealing with property dispositions upon death (see majority op. at 2). In light of that holding, the majority answers in the negative the first question of law certified to us by the United States Court of Appeals for the Second Circuit, and it declines to answer the second question on the ground that no answer is necessary to the resolution of this appeal (see majority op. at 4, 15).

In reaching the erroneous conclusion that the decedent Reverend Clark Flesher and the Ministers and Missionaries Benefit Board ("MMBB") implicitly waived the provisions of EPTL § 3-5.1 (b) (2) via the governing-law clauses of their death benefit and retirement plans, the majority relies on our decision in IRB-Brasil Resseguros, S.A. v Inepar Invs., S.A. (20 NY3d 310 [2012]). But, a close examination of that decision reveals that the majority is incorrect, for IRB-Brasil Resseguros, S.A. identifies New York substantive law, such as EPTL § 3-5.1 (b) (2), as exactly the sort of New York law invoked by a governing-

law clause of the kind at issue here.  Consequently, I would answer the first certified question in the affirmative.  Furthermore, because the plain language of EPTL § 3-5.1 (b) (2) clearly demonstrates that the benefit plans at issue here are covered by that statute, the second certified question should be answered in the affirmative as well.  Accordingly, I respectfully dissent from the majority's decision to answer the first certified question in the negative and to decline to answer the second certified question.

I.

A

The first certified question asks "[w]hether a governing-law provision that states that the contract will be governed by and construed in accordance with the laws of the State of New York, in a contract not consummated pursuant to New York General Obligations Law section 5-1401, requires the application of New York Estates, Powers & Trusts Law section 3-5.1(b)(2), a New York statute that may, in turn, require application of the law of another state" (see Ministers & Missionaries Benefit Bd. v Estate of Flesher, 780 F3d 150, 155 [2d Cir 2014]).

The statute at the heart of this question, EPTL § 3-5.1 (b) (2), is part of the EPTL article setting forth the "[s]ubstantive [l]aw of [w]ills" (EPTL art 3); the statute states, "[t]he intrinsic validity, effect, revocation or

alteration of a testamentary disposition of personal property, and the manner in which such property devolves when not disposed of by will, are determined by the law of the jurisdiction in which the decedent was domiciled at death."  Thus, under the statute, if the decedent is domiciled in New York at the time of death, the devolution of property not disposed of by will is determined by, among other provisions, EPTL § 5-1.4, which declares in relevant part:

> "[e]xcept as provided by the express terms of a governing instrument, a divorce . . . revokes any revocable (1) disposition or appointment of property made by a divorced individual to, or for the benefit of, the former spouse, including, but not limited to a disposition or appointment by will, by security registration in beneficiary form (TOD), by beneficiary designation in a life insurance policy or (to the extent permitted by law) in a pension or retirement benefits plan" (EPTL § 5-1.4 [a]).

Accordingly, when a person dies while domiciled in New York, his or her ex-spouse cannot recover any death or retirement benefits under the decedent's relevant plans because the divorce prior to death serves as a revocation of the beneficiary designation by operation of law.  However, since the statute does not cut off the ex-spouse's family members, New York law would still appear to permit a resident decedent's former in-law named as a beneficiary of such plans to recover the benefits upon the death of the decedent, notwithstanding the divorce.  By contrast, the former in-law's beneficiary designation would be revoked if the decedent perished while domiciled in another jurisdiction,

such as Colorado, which has a statute automatically removing ex-spouses and their relatives as beneficiaries of the decedent's benefit policies upon death (see Colo Rev Stat § 15-11-804 [2]).

In addition to these statutory principles, we must look to the relevant rules for interpreting a benefit plan to discern the manner in which EPTL § 3-5.1 (b) (2) impacts such plans. Because the MMBB policies at issue in this case are, in effect, contracts between Flesher and MMBB for the payment of death and retirement benefits, they are logically subject to the same rules of construction as a life insurance policy or similar contract. Under those rules, a court "bear[s] the responsibility of determining the rights or obligations of parties under insurance contracts based on the specific language of the policies," and unambiguous provisions "must be given their plain and ordinary meaning" (Sanabria v American Home Assurance Co., 68 NY2d 866, 868 [1986]). "Contracts of insurance, like other contracts, are to be construed according to the sense and meaning of the terms which the parties have used, and if they are clear and unambiguous the terms are to be taken and understood in their plain, ordinary and proper sense" (Johnson v Travelers Ins. Co., 269 NY 401, 408 [1936]; see Roman Catholic Diocese of Brooklyn v National Union Fire Insurance Company of Pittsburgh, 21 NY3d 139, 148 [2013]). A contract's express choice-of-law clause takes precedence over any contrary common-law choice-of-law principles, provided that the contract has some reasonable relationship to

New York and does not violate New York public policy (see Reger v National Ass'n of Bedding Mfrs Group Ins. Trust Fund, 83 Misc 2d 527, 540-541 [Sup. Ct. Westchester Co. 1975]; see also Bank of N.Y. v Yugoimport, 745 F3d 599, 609 [2d Cir 2014]; see generally Welsbach Elec. Corp. v MasTec N. Am., Inc., 7 NY3d 624, 629 [2006] ["Generally, courts will enforce a choice-of-law clause so long as the chosen law bears a reasonable relationship to the parties or the transaction," unless the chosen law "violates some fundamental principle of justice, some prevalent conception of good morals, some deep-rooted tradition of the common weal"] [internal quotation marks and citations omitted]).

We reaffirmed this principle in IRB-Brasil Resseguros, S.A. v Inepar Invs., S.A. (20 NY3d at 310), a case that did not involve the disposition of property upon death. In IRB-Brasil Resseguros, S.A., the plaintiff Brazilian corporation purchased a series of notes issued by the defendant Uruguayan power company (see id. at 312-313). The guarantee contract under which the notes were issued stated that the agreement would be "governed by, and . . . be construed in accordance with, the laws of the State of New York" (id. at 313). Because the parties' transaction involved the exchange of more than $250,000, it fell within the ambit of General Obligations Law § 5-1401 (1), which states in relevant part, "'[t]he parties to any contract . . . arising out of a transaction covering in the aggregate not less than two hundred fifty thousand dollars . . . may agree that the

law of this state shall govern their rights and duties in whole or in part, whether or not such contract, agreement or undertaking bears a reasonable relation to this state'" (id. at 314, quoting General Obligations Law § 5-1401 [1]).  Eventually, the defendant corporation defaulted on its obligations under the notes, and the plaintiff corporation sued to recover damages under the guarantee contract (see id. at 313-314).  The defendant corporation opposed the suit in part on the ground that, under a New York common-law conflict-of-laws analysis, Brazilian substantive law should be applied in interpreting the contract (see id. at 313).

On appeal, we decided that New York substantive law, but not New York choice-of-law principles or Brazilian law, controlled the interpretation of the contract in accordance with the choice-of-law clause (see id. at 314-316).  As a starting point for the analysis, we determined that the Legislature had passed General Obligations Law § 5-1401 out of concern that parties to large contracts, which lacked sufficient contacts with New York, might be unable to effectively invoke New York substantive law, despite an express contractual provision designating New York law as the controlling legal framework, because courts might apply common-law choice-of-law principles and decide that the law of a jurisdiction with a greater connection to the transaction should control (see id. at 314).  Hence, the statute was designed to allow parties to large

contracts that were otherwise unconnected to New York to choose to have their contracts interpreted in accordance with New York law (see id. at 315).

"Applying General Obligations Law §§ 5-1401 and 5-1402 to the facts of the present case," we "conclude[d] that New York substantive law must govern, since the parties designated New York in their choice-of-law provision in the Guarantee and the transaction exceeded $ 250,000" (id. at 315). We also rejected the defendant corporation's argument that the entirety of New York common law, including New York's common-law choice-of-law principles, should control the interpretation of the contract because the guarantee contract used the unlimited phrase "governed by . . . the laws of the State of New York," without explicitly excluding New York choice-of-law rules (id. at 315). We explained:

> "Express contract language excluding New York's conflict-of-laws principles is not necessary. The plain language of General Obligations Law § 5-1401 dictates that New York substantive law applies when parties include an ordinary New York choice-of-law provision, such as appears in the Guarantee, in their contracts. The goal of General Obligations Law § 5-1401 was to promote and preserve New York's status as a commercial center and to maintain predictability for the parties. To find here that courts must engage in a conflict-of-laws analysis despite the parties' plainly expressed desire to apply New York law would frustrate the Legislature's purpose of encouraging a predictable contractual choice of New York commercial law and, crucially, of eliminating uncertainty regarding the governing law." (id. at 315-316).

We also observed that the Restatement (Second) of Conflict of Laws supported the conclusion that the contractual choice-of-law clause was intended to apply only New York substantive law because that treatise said, "'in the absence of a contrary indication of intention, the reference [to the law of the state chosen by the parties] is to the local law of the state of the chosen law'" (id. at 316, quoting Restatement [Second] of Conflict of Laws § 187 [3]).  Importantly, we continued, "'[l]ocal law' is defined as 'the body of standards, principles and rules, exclusive of its rules of Conflict of Laws'" (id. [emphasis in original], quoting Restatement [Second] of Conflict of Laws § 4 [1]).  Thus, we said, "[u]nder the Restatement (Second), the parties' decision to apply New York law to their contract results in the application of New York substantive law, not New York's conflicts principles," and we added, "[i]t strains credulity that the parties would have chosen to leave the question of the applicable substantive law unanswered and would have desired a court to engage in a complicated conflict-of-laws analysis, delaying resolution of any dispute and increasing litigation expenses" (id. at 316).  Accordingly, IRB-Brasil Resseguros, S.A. holds that a contract which both is subject to General Obligations Law § 5-1401 and designates New York law as controlling must be interpreted in accordance with New York substantive law, and the decision supports the more general proposition that, in most instances, a contractual provision

stating that New York law governs must be read to invoke only New York substantive law, rather than common-law choice-of-law principles.

The principle that a contractual governing-law provision generally precludes a common-law choice-of-law analysis has never been extended to eliminate the application of a statutory choice-of-law directive, which otherwise would be the applicable local and substantive law of the State (see Restatement [Second] of Conflict of Laws § 4 [1]).  In fact, as we explained in IRB-Brasil Resseguros, S.A., the parties' choice of New York law does not remove a contract from the ambit of "'[l]ocal law,'" and because such local law includes New York's substantive "'body of standards, principles and rules,'" New York statutory standards, principles and rules logically govern a contract that deems the State's law to be controlling (IRB-Brasil Resseguros, S.A., 20 NY3d at 316, quoting Restatement [Second] of Conflict of Laws § 4 [1]).

In that vein, there is ample authority demonstrating that a New York statute embodies the State's substantive policy, which we cannot readily presume to have been cast aside by a contractual governing-law provision.  New York courts have held that where a conflict arises between the provisions of a statute and the terms of a contract, the statute typically controls because it is the binding substantive policy determination of the Legislature (see e.g. Fred Schutzman Company v Park Slope

Advanced Medical, PLLC, 128 AD3d 1007, 1008 [2d Dept 2015] (Liberty Mut. Ins. Co. v Aetna Cas. & Sur. Co., 168 AD2d 121, 131 [2d Dept 1991]), though a statutory right may be waived expressly or by unequivocal and necessary implication (see John J. Kassner & Co. v New York, 46 NY2d 544, 551 [1979]; O'Brien v Lodi, 246 NY 46, 50 [1927]). Additional authority for a statute's role as the substantive local law of a state can be found in the Restatement (Second) of Conflict of Laws, which declares that "[a] court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law" (Restatement [Second] of Conflict of Laws § 6 [1] [emphasis added]). Thus, unlike the common-law conflict rules at issue in IRB-Brasil Resseguros, S.A. and similar cases, statutory rules make up the substantive law of the state and cannot be easily or presumptively dispensed with by contrary provisions of a contract; indeed, in some instances, it is impossible for contracting parties to avoid the application of a state statute, even where they clearly and expressly agree to do so (see CONRAIL v Hudacs, 223 AD2d 289, 293 [3d Dept 1996], aff'd 90 NY2d 958 [1997]; cf. Estro Chemical Co. v Falk, 303 NY 83, 87 [1951]). It follows that, where, as here, the parties have agreed to apply the substantive law of New York, they presumably have agreed to eliminate common-law choice-of-law rules that are inconsistent with their definitive choice of law under the contract (see IRB Brasil Resseguros, N.A., 20 NY3d at 316), but they have not

clearly manifested an intent to waive application of statutory choice-of-law directives such as EPTL § 3-5.1 (b) (2), which form part of the very substantive law that the parties have opted to apply.

B

Nonetheless, the majority insists that EPTL § 3-5.1 (b) (2) is a choice-of-law rule that stands on equal footing with the common-law choice-of-law principles discussed in <u>IRB-Brasil Resseguros, S.A.</u>, such that a contractual choice-of-law clause necessarily forecloses application of the statute in the same manner as it does the common-law rules (<u>see</u> majority op. at 9-11).  In this respect, the majority's argument appears to rest on two false premises: (1) a statute that directs the application of another state's testamentary laws is no different from the common law's contacts-based choice-of-law framework and hence can never be a substantive law (<u>see</u> majority op. at 10); and (2) the enforcement of a statute that is based on a common-law rule may be easily waived in the same manner as the common-law rule that inspired it (<u>see</u> majority op. at 11).  As will be shown, however, the first premise is unfounded in this case because it is contrary to the basic character and history of EPTL § 3-5.1 (b) (2) (not to mention the authorities discussed above), and the second premise is not supported by any legal authority.

In adopting the first premise set forth above, the majority misapprehends the nature of EPTL § 3-5.1 (b) (2).  While

EPTL § 3-5.1 (b) (2) does direct the choice of a particular state's law on the handling of a certain type of property upon a person's death, it does not codify the sort of complex decisional choice-of-law analysis which parties presumably seek to avoid in agreeing that the law of New York will govern a contract.  Unlike that common-law analysis, which requires the parties to any type of contract to determine on a case-by-case basis whether they and the transaction have sufficient contacts with a particular state to trigger the application of that state's substantive law (see Zurich Ins. Co. v Shearson Lehman Hutton, Inc., 84 NY2d 309, 317-320 [1994]), the statute here provides clearer guidance for a narrower subset of contracts by specifying that the law of the decedent's domicile at death will invariably apply to a testamentary or similar disposition of personal property.  In this sense, EPTL § 3-5.1 (b) (2) is just as much a substantive determination of the most reasonable means to dispose of personal property as it is a choice-of-law measure, and as a result, it does not set forth simply another extremely broad and complex conflict analysis that may be presumptively discarded by a contractual governing-law clause.

Indeed, the Legislature plainly considered EPTL § 3-5.1 (b) (2) to be a significant part of the State's substantive policy regarding the distribution of personal property upon death, distinguishing it from conflict principles that arose purely from decisional law and are not protected by legislation.

The Legislature enacted the predecessor statutes to EPTL § 3-5.1 (b) (2) to enshrine in New York statutory law the common-law rule that the law of the state where a decedent is domiciled at the time of death should govern the disposition of personal property upon death (see Revisers' Notes, EPTL § 3-5.1; see also Matter of Gifford, 279 NY 470, 474-475 [1939]).  In taking this step, the Legislature evidently made a substantive decision that the aforementioned rule was so important that it should not be disturbed in this State by any subsequent change in the common law via judicial decision-making.

In addition, the Legislature enacted substantive changes to the scope of this rule over time, making conscious policy choices to chart the course of this aspect of estates law. When the rule first appeared in statutory form in 1889, the statute stated, "[e]xcept where special provision is otherwise made by law, the validity and effect of a testamentary disposition of any other property [besides realty] situated within the State, and the ownership and disposition of such property, where it is not disposed of by will, are regulated by the laws of the state or country, of which the decedent was a resident, at the time of his death" (Annotated Code of Civil Procedure of 1889, § 2694).  In 1911, when the Legislature passed Decedent Estate Law ("DEL") § 47, it set forth the same rule but gave individuals some flexibility to choose the law of disposition for all of their personal property in the express

provisions of a will -- not other means of disposition -- by adding, "[w]henever a decedent, being a citizen of the United States, wherever resident, shall have declared in his will and testament that he elects that such testamentary dispositions shall be construed and regulated by the laws of this state, the validity and effect of such dispositions shall be determined by such laws" (L 1911, ch 244, § 1).

Furthermore, the incorporation of DEL § 47 into the EPTL via section 3-5.1 (b) (2) was no less substantive than the previous legislation. In that regard, the Legislature passed EPTL § 3-5.1 (b) (2) as part of a legislative package meant to overhaul the substance of New York's estates law. As stated by a member of the Temporary Commission on Estates, which drafted the EPTL, the legislation was a provision "for the substantive law" and designed "to collect into one volume all the substantive law relating to estates" (Letter of Hon. John M. Keane, Bill Jacket, L 1966, ch 952 at 76). In approving the legislation, the Governor noted that it "ma[de] numerous substantive changes in existing law" and wisely consolidated previous enactments in this field (Governor's Memorandum of Approval, Bill Jacket, L 1966, ch 952, at 91). Indeed, article 3 of the EPTL, which contains EPTL § 3-5.1 (b) (2), is entitled "Substantive Law of Wills" (EPTL article 3), underscoring that its provisions, such as EPTL § 3-5.1 (b) (2), are exactly the sort of substantive expression of New York public policy that contracting parties adopt when they

agree to have their agreement governed by New York law.[1]

As for EPTL § 3-5.1 more particularly, the Legislature passed that statute in response to substantive policy concerns. One scholar has described the development of the statute and the driving policy considerations behind it as follows:

> "Recognizing 'the need for a fresh approach to the legal problems presented by multi-jurisdictional transactions and for a release from the traditional bind of antiquated and moribund rules,' the Bennett Commission undertook to design 'substantive rules to govern the testamentary and intestate distribution of multi-jurisdictional estates.' The resulting comprehensive set of rules for the regulation of wills and estates that are related to a jurisdiction other than New York is set forth in EPTL 3-5.1 and makes New York 'a pathfinder in this area of estate law.'" (Joseph T. Arenson, An Analysis of Certain Provisions of the Estates, Powers and Trusts Law, 33 Brook L Rev 425, 445 [1966]).

And while this new "pathfind[ing]" law "codified" the "settled rule that the intestate distribution of the personal property of a decedent be determined by the law of his domicile at the time

---

[1] The majority observes that the title of article 3 "is not dispositive" because the "text of [a] statute takes precedence over title, which cannot alter or limit the language in the body of a statute itself" (majority op. at 11 n4). That is true, and I do not suggest otherwise. But it is equally true that the title of article 3 is in accord with the plain meaning of the text and history of EPTL § 3-5.1 (b) (2), all of which support the conclusion that EPTL § 3-5.1 (b) (2) is part of the substantive law of New York (see D'Amico v Christie, 71 NY2d 76, 84 [1987] [where statutory text and history suggest a certain interpretation, the title of the statute reinforces that interpretation because the law's meaning "is made plain even by its title"]).

of his death," it did so in the context of a statutory framework that had been "clarified and _expanded_" by EPTL § 3-5.1 as a whole (id. at 445-448 [emphasis added]).  In other words, EPTL § 3-5.1 is not a reflexive or inconsequential repetition of a common-law conflict principle that might be readily waived sub silentio by parties to a contract, but instead represents the Legislature's considered judgment to keep some aspects of the common law constant while simultaneously modifying others.  As a result, EPTL § 3-5.1 (b) (2) works in tandem with the other provisions of the EPTL to create a body of local substantive standards for the disposition of personal property upon a person's death, and contracting parties' choice of New York law invokes, and does not waive, the enforcement of the statute.

This legislative policy choice casts the contracts here in a different light than the one in IRB-Brasil Resseguros, S.A. In that case, because the contract fell within the ambit of General Obligations Law § 5-1401, we interpreted the contract in light of the policy behind that statute (see IRB-Brasil Resseguros, S.A., 20 NY3d at 313-315).  Given that General Obligations Law § 5-1401 reflected the Legislature's desire to make it easier for parties to large contracts to avoid a common-law choice-of-law analysis, we harmonized that policy with the language of the contract to infer that the parties' generalized invocation of New York law reflected their intent to waive the application of common-law conflict rules in a manner consistent

with -- indeed, buttressed by -- the legislative scheme, and in that context, we concluded that it would have made little sense to draw a contrary inference regarding the parties' wishes (see id. at 315-316).  By contrast, here, any inference that the parties intended to eliminate the application of EPTL § 3-5.1 (b) (2) would be in tension with the Legislature's desire to ensure that, in most cases, personal property not disposed of by will shall pass in accordance with the laws of the decedent's last domicile, and hence we must reject the view that the parties implicitly signaled an intent to abandon that legislative directive and instead interpret the contract consistently with the substantive policy embodied in EPTL § 3-5.1 (b) (2), just as we did in IRB-Brasil Ressequros, S.A.

Moreover, even if it can be assumed that the parties to a contract usually mean to escape the reach of certain state statutes solely by declaring that the contract will be "governed by the laws of New York," it would make little sense to make that assumption with respect to the particular statute at issue here. After all, the parties to a death benefit contract would ordinarily expect that, regardless of which state's law they choose, they will be subject to the rule that the law of the state of domicile determines the recipients of personal property upon the owner's death.  That is so because a clear majority of states follow that rule (see Hoglan v Moore, 219 Ala 497, 501 [Ala 1929]; Vansickle v Hazeltine, 29 Idaho 228, 233-234 [Idaho

1916]; <u>Gibson v Dowell</u>, 42 Ark 164, 166 [AK 1883]; <u>Estate of Moore</u>, 190 Cal App 2d 833, 841-843 [Cal Ct App, 4th App Dist 1961]; <u>Estate of Madril v Madril</u>, 71 Colo 123, 126 [Colo 1922]; <u>Oehler v Olson</u>, 2005 Conn Super LEXIS 574, *5-*6 [Conn Super Ct 2005]; <u>PNC Bank v N.J. State SPCA</u>, 2008 Del Ch LEXIS 288, *5 n3 [Del Ch 2008]; <u>Cockrell v Lewis</u>, 389 So 2d 307, 308 [Fla Dist Ct App 5th Dist 1980]; <u>In re Estate of Grant</u>, 34 Haw 559, 564 [Haw 1938]; <u>Davis v Upson</u>, 209 Ill 206, 212-213 [Ill 1904]; <u>Thieband v Sebastian</u>, 10 Ind 345, 347 [Ind 1858]; <u>Estate of Lincoln v Briggs</u>, 199 NW2d 337, 338 [Iowa 1972]; <u>In re Estate of Rivas</u>, 233 Kan 898, 901 [Kan 1983]; <u>Radford v Fidelity & Columbia Trust Co.</u>, 185 Ky 453, 459 [Ky 1919]; <u>Williams v Pope Mfg. Co.</u>, 52 La Ann 1417, 1438-1439 [LA 1900]; <u>Smith v Howard</u>, 86 Me 203, 205-206 [Me 1894]; <u>Harding v Schapiro</u>, 120 Md 541, 548 [Md 1913]; <u>Blake v Williams</u>, 23 Mass 286, 314 [Mass 1828]; <u>In re Stewart Estate</u>, 342 Mich 491, 499-501 [Mich 1955]; <u>Lane v St. Louis Union Trust Co.</u>, 356 Mo 76, 82 [Mo 1947]; <u>In re Smith's Estate</u>, 126 Mont 558, 563 [Mont 1953]; <u>In re Estate of Forney</u>, 43 Nev 227, 232 [Nev 1919]; <u>Cade v Davis</u>, 96 NC 139, 147 [NC 1887]; <u>In re Estate of Coleman</u>, 98 NW2d 784, 789 [ND 1959]; <u>Estate of Luoma</u>, 2011-Ohio-4701, P28 [Ohio Ct App 2011]; <u>In re Revard's Estate</u>, 1936 OK 844, P10 [Okla 1936]; <u>Pickering v Pickering</u>, 64 RI 112, 117-120 [RI 1940]; <u>cf. Smith v Normart</u>, 51 Ariz 134, 138 [Ariz 1938]; <u>but</u> <u>see</u> <u>Neblett v Neblett</u>, 112 Miss 550, 559 [Miss 1916]; <u>State by Van Riper v Am. Sugar Ref. Co.</u>, 20 NJ 286, 301-302 [NJ 1956]).  Therefore,

although the parties here presumably wished that New York contract interpretation rules would determine the decedent's rights during life and some other aspects of the contract, it would have been odd for them to have sought the application of an outlier rule for choosing the law regarding the disposition of the property upon death.

By the same token, the commonplace nature of the rule set forth in EPTL § 3-5.1 (b) (2) belies the majority's suggestion that Flesher and MMBB could not have anticipated that their benefit contracts would trigger the law of the state where Flesher would be domiciled at death (see majority op. at 14; id. at n7).[2]  Certainly, MMBB, which has as one of its central

_____

[2]  In discussing the expectations of the parties to the contracts here, the majority seems to focus primarily on MMBB's expectations and lack of desire to transfer the benefits of the plans in accordance with EPTL § 3-5.1 (b) (2) (see majority op. at 13-14).  To an extent, this approach is understandable because MMBB drafted the plans at issue here and had more control over their terms.  But a focus on MMBB's presumed wish to avoid the purported burdens imposed by EPTL § 3-5.1 (b) (2) -- a wish not directly expressed in the benefit plans -- overlooks the fact that Flesher presumably expected that his property would devolve in accordance with the entirety of New York's substantive statutory law, i.e., that all of his personalty would pass under the laws of the State where he chose to live out his final days. Indeed, while the majority assumes that Flesher wanted to give up the protections which that State's law might confer upon his property, such as the automatic elimination of the inheritance rights of his ex-spouse LeAnn Snow and her family, there is no basis for that assumption, especially since there is no indication that Flesher willingly waived the potential benefits of EPTL § 3-5.1 (b) (2) in exchange for some particular valuable consideration (cf. Welsbach Elec. Corp., 7 NY3d at 630 ["[n]o good reason can be suggested why a contractor cannot, for a valuable consideration, waive the provisions of the statute

purposes the administration of property distributions upon a plan member's death, had good reason to learn of the widespread domicile-based rule and to explicitly waive application of that principle if it saw fit to do so.  Instead, MMBB agreed to contracts containing only a generic invocation of New York law, without addressing either EPTL § 3-5.1 (b) (2) in particular or the routinely-followed doctrine it embodies more generally.

The majority also claims that, absent a finding that a generalized governing-law clause presumptively waives statutory choice-of-law directives such as EPTL § 3-5.1 (b) (2), benefit plan administrators will face the intolerable burden of familiarizing themselves with the revocation laws of every state where plan members might die because they cannot know in advance the state of domicile at death (see majority op. at 13-14).  Initially, though, there is no proof in the record of the extent of this alleged burden, and nothing suggests that organizations like MMBB are unable to have their attorneys perform the necessary research without extreme expense or delay.  More to the point, plan administrators can eliminate this burden by adding an extra sentence to each benefit contract expressly precluding the application of the chosen jurisdiction's statutory choice-of-law directives.

All of the foregoing discussion belies the majority's

---

giving him the right to file a notice of lien"] [emphasis added, internal quotation marks, punctuation and citation omitted]).

evident belief that EPTL § 3-5.1 (b) (2) is no different than, and creates the same practical difficulties as, the common-law conflicts analysis discussed in <u>IRB-Brasil Resseguros, S.A.</u>

As for the second major premise underlying the majority's opinion -- that a statute based on the common law may be waived by a generalized governing-law clause because such a clause may waive certain common-law rules -- it is simply unprecedented. The majority does not cite any authority for the novel proposition that a statute inspired by the common law may be more readily evaded by a governing-law clause than a statute designed to depart from the common law, and there is no logical support for that notion. Regardless of whether the Legislature adopts or disavows a common-law principle in passing a law, the statute retains its force as a binding substantive policy choice of the State, compelling the adherence of contracting parties absent a clear waiver of its application. Indeed, if anything, the Legislature's decision to incorporate a common-law rule into a statute shows its desire to elevate the rule's stature above its prior position as an ordinary common-law rule that might have been more easily waived.

In sum, a contract section that specifies that the contract must be "governed by and construed in accordance with the laws of the State of New York" should be interpreted to incorporate the entire body of New York's substantive statutory law (<u>see</u> Restatement [Second] of Conflict of Laws §§ 187 [1]; 187

[3]), including EPTL § 3-5.1 (b) (2).  Thus, I would answer the first certified question in the affirmative.

II.

Because I would answer the first certified question in the affirmative, I find it necessary to answer the second certified question to resolve this case.  The second question asks "whether a person's entitlement to proceeds under a death benefit or retirement plan, paid upon the death of the person making the designation, constitutes 'personal property . . . not disposed of by will' within the meaning of New York Estates, Powers & Trusts Law section 3-5.1(b)(2)" (Matter of Missionaries and Ministers Benefit Bd., 780 F3d at 155).  As noted in this question, EPTL § 3-5.1 (b) (2) applies to, among other things, a decedent's "personal property . . . not disposed of by will," and it incorporates a related statutory subsection's definition of "personal property" as "any property other than real property, including tangible and intangible things" (EPTL § 3-5.1 [a] [2]). The parties agree that, in general, a benefit plan and the rights thereunder are "personal property," as those contractual rights are "intangible things" which do not create or transfer an interest in real property.

The Snows nevertheless assert that the plan and any payments thereunder were not Flesher's personal property, and hence are not his estate's property, because MMBB must transfer all benefits under the plans to the Snows immediately upon death

in accordance with the beneficiary designation forms.  But a member of a benefit plan, such as Flesher, personally controls the entitlement to the proceeds of the plan, holding an intangible property right that is "personal" to the member and subject to his or her disposition "not by will" via the governing contract (EPTL § 3-5.1 [b] [2]).  In that regard, like the holder of a life insurance policy, a member of a benefit plan essentially owns the benefits of the plan while he or she is alive because he or she can control the transfer of those funds by choosing a beneficiary.  It is for this reason that, under the common law of this State, a life insurance policy has traditionally been regarded as a chose in action, which is the personal property of the holder (see Olmsted v Keyes, 85 NY 593, 591-601 [1881]).  Thus, a benefit plan and its attendant rights are the "personal property" of the plan member during his or her life within the meaning of EPTL § 3-5.1 (b) (2), and until the validity of a beneficiary designation can be conclusively established in a probate proceeding, these property rights become inextricably linked with the plan member's estate and the proceedings thereon following his or her death.

Additionally, a death benefit plan and a retirement benefit plan confer property rights that are "not disposed of by will within the meaning of EPTL § 3-5.1 (b) (2).  It is true, as the Snows observe, that the phrase "not disposed of by will," read in isolation, could be construed as a reference to the

transfer of property in accordance to the rules of intestate succession rather than by a written instrument like a benefit plan.  However, in the context of the remaining terms of EPTL § 3-5.1 (b) (2), the disputed phrase applies to benefit plans. Notably, the statute is broadly worded to apply to virtually all dispositions of personal property upon death, including both "testamentary disposition[s]" of property and the "dev[olution]" of property "not disposed of by will," and given this wide-ranging language, it makes sense to interpret the phrase "not disposed of by will" to cover both property that passes by rules of intestate succession and property, such as entitlements under a benefit plan, that devolves via a beneficiary designation not included in a formal will.  Accordingly, because a benefit plan, which belongs to the plan member in life and transfers funds upon death, resembles a substitute testamentary instrument such as a trust with lifetime benefits (see e.g. Matter of Estate of Reynolds, 87 NY2d 633, 636 [1996] [trust as testamentary instrument] Matter of Estate of Riefberg, 58 NY2d 134, 138-139 [1983] [stockholders' agreement]; see also 38 NY Jur Decedents' Estates § 260) and yet is not technically a will or controlled thereby, it qualifies as personal property of the decedent which is "not disposed of by will" under EPTL § 3-5.1 (b) (2).

The Snows maintain that it would be illogical to hold that EPTL § 3-5.1 (b) (2) governs death and retirement benefit plans because another statute, EPTL § 13-3.2 (a), expressly

preserves plan beneficiary designations that EPTL § 3-5.1 (b) (2) might otherwise disrupt if it applied to such benefit plans. However, this contention runs afoul of the modest intended scope of EPTL § 13-3.2 (a).  That statute says, "[i]f a person is entitled to receive [ ] payment in money, securities or other property under a pension, retirement, death benefit, stock bonus or profit-sharing plan . . . the rights of persons so entitled or designated and the ownership of money, securities or other property thereby received shall not be impaired or defeated by any statute or rule of law governing the transfer of property by will, gift or intestacy."  At first glance, because my reading of EPTL § 3-5.1 (b) (2) would make it a statute that governs a vast array of transfers of personal property upon the death of the owner, including transfer by will or intestacy, EPTL § 13-3.2 (a) arguably seems to preserve beneficiary designations in benefit plans, even where EPTL § 3-5.1 (b) (2) threatens to undo those designations.  But the legislative history of the statute clarifies that this provision was never intended to create the sort of perplexing conflict with EPTL § 3-5.1 (b) (2) that the Snows envision.

As observed by the Appellate Division in <u>Kane v Union Mut. Life Ins.</u> (84 AD2d 148 [2d Dept 1981]), the legislative history of EPTL § 13-3.2 (a) reveals that it was primarily intended to recodify a provision of the Personal Property Law that had prevented courts and estate representatives from

invalidating beneficiary designations on the ground that the designation forms did not bear the same formalities as a will. The Appellate Division explained:

> "Generally stated, the law of this State is that the designation of a beneficiary to a pension, retirement annuity or other insurance contract is not a testamentary act which must comply with the Statute of Wills (see Study: Braucher, Unification of the Rules Governing Payment of Funds by Institutional Debtors on Death of the Person Entitled and Designations of Beneficiaries to Receive Payment of Such Funds, 1951 Report of NY Law Rev Comm, pp 609, 618). Former section 24-a of the Personal Property Law, the predecessor of EPTL 13-3.2, was recommended by the Law Revision Commission simply to remove 'any doubt as to the validity and effectiveness of beneficiary designations' of pension, annuity and insurance contracts and to indicate that such designations were not required to be executed with the formality required by the Statute of Wills (see 1952 Report of NY Law Rev Comm, p 177). Accordingly, the statute provides that the rights of such beneficiaries 'shall not be impaired or defeated by any statute or rule of law governing the transfer of property by will, gift or intestacy' (EPTL 13-3.2, subd [a]), provided that the designation is made in writing, is signed by the person making it, and is, so far as here relevant, made in accordance with the rules prescribed for the pension plan or is agreed to by the insurer (EPTL 13-3.2, subd [d], pars [1], [2]). Thus, the statute relied upon by the Kane sons merely provides that such designations of beneficiaries are not invalid if accomplished by a document not executed with the formalities required by the Statute of Wills, but it does not answer the question raised here, the converse of that proposition, namely, whether a provision in a will changing the beneficiaries of an insurance contract is valid." (id. at 151 [emphasis in original]).

Clearly, then, the statute was intended to overcome a technicality regarding the formalities required by the Statute of Wills, not to prevent the application of EPTL § 3-5.1 (b) (2) and similar laws to benefit plans. That being so, EPTL § 13-3.2 (a) does not cast doubt on my proposed application of EPTL § 3-5.1 (b) (2) to benefit plans. In light of my conclusion that the latter statute encompasses death benefit and retirement plans, I would answer the second certified question in the affirmative.

### III.

In relation to contracts, choice-of-law issues are often vexing and complex, routinely dividing courts over the conclusion that a certain state's law applies and the proper method by which such a conclusion should be reached. But, the vagaries of this area of law should not cause us to lose sight of the vital substantive policies established by the Legislature, and where it is possible to reconcile those policies with the terms of the parties' contract, it behooves us to do so. Here, because the substantive policy of New York requires the application of EPTL § 3-5.1 (b) (2) to retirement and death benefit plans, I conclude that, absent an unequivocal waiver of the statute's application, benefit plans of the kind at issue here should be interpreted to trigger EPTL § 3-5.1 (b) (2). Accordingly, I would answer the first and second certified questions in the affirmative, and I dissent from the majority's contrary decision.

*   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

Following certification of questions by the United States Court of Appeals for the Second Circuit and acceptance of the questions by this Court pursuant to section 500.27 of this Court's Rules of Practice, first certified question answered in the negative and second certified question not answered as academic.  Opinion by Judge Stein.  Chief Judge Lippman and Judges Pigott and Fahey concur.  Judge Abdus-Salaam dissents and votes to answer the certified questions in the affirmative in an opinion in which Judge Rivera concurs.


Decided December 15, 2015